# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRY GLASS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 13-1173 |
| ) | Judge Nora Barry Fischer |
| ARMSTRONG UTILITIES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On August 14, 2013, Plaintiff Terry Glass ("Plaintiff") initiated this civil action against his former employer, Armstrong Utilities ("Armstrong" or "Defendant"). In his amended complaint, Plaintiff raised claims of discrimination, retaliation, and wrongful termination on account of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA") and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*. ("PHRA").

Presently pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 29), Plaintiff's Brief in Opposition (ECF No. 34), and Defendant's Reply Brief (ECF No. 39). For the reasons set forth below, Defendant's Motion for Summary Judgment will be GRANTED.

### II. FACTUAL BACKGROUND

On October 29, 2007, Plaintiff commenced employment with Defendant, a cable and internet provider, as a cable installer and technician. (ECF No. 32-1 at 32; ECF No. 32-2 at 141). Prior to November 5, 2008, Plaintiff's direct supervisor was Jim Bahorich ("Bahorich").

(ECF No. 32-5, Tab E, ¶ 2). Thereafter, Plaintiff's direct supervisor was Greg Plutnicki ("Plutnicki"). (*Id*.). Plutnicki and Bahorich each reported to their manager, Jim Charles ("Charles"), who in turn reported to regional manager Joe Taylor ("Taylor"). (ECF No. 32-1 at 38).

As an install technician, the bulk of Plaintiff's work involved entering into customers' homes or offices for the purpose of installing and replacing equipment related to television, telephone, and internet cable services. (ECF No. 32-1 at 32-35). At the beginning of each workday, Plaintiff and his coworkers reported to an office in Grove City, Pennsylvania, and received a worksheet containing a list of work orders for the day. (*Id*. at 41, 44). Work orders were distributed amongst the install technicians by an automated computer program ("auto-router") operated by an ISP Technician, Vincent D'Antonio. (ECF No. 32-5, Tab E, ¶ 4). When an installer finished all of the work orders on his worksheet, he was required to telephone the company's dispatch department to let them know that he was finished so that dispatch could send him to help any other installers who might be running behind. (ECF No. 32-1 at 68-69).

In addition to his daily work orders, Plaintiff and his coworkers were required to regularly spend a week "on call" to respond to issues from customers requiring immediate attention outside of normal work hours, such as telephone or internet outages. (ECF No. 32-1 at 57-59). Plaintiff's on-call team consisted of himself and Ed Miloser, Brian Kocher, Eric White, Matthew Barnett, Steve Fucsko, and David Leopald. (*Id*. at 57-58). Dispatchers assigned jobs to members of the on-call team on a rotating basis. (*Id*. at 58-59, 62).

On Friday mornings, Plaintiff and his co-workers attended weekly staff meetings at Defendant's office in Grove City, Pennsylvania. (ECF No. 32-5, Tab D, at 20-22). Those meetings were typically run by Taylor, Charles and Plutnicki. (*Id*. at 22). After the group

meetings, Charles would frequently pull an employee into his office to criticize him for his performance or for making mistakes. (ECF No. 32-2, at 119-20; ECF No. 32-5, Tab G, at 32, 40-41). Plaintiff, in particular, was targeted for these closed-door meetings with Charles so often that his co-workers begin to joke that he had "a black cloud" over his head. (ECF No. 32-2 at 112-15).

On June 23, 2009, Plaintiff visited his physician at Cranberry Internal Medicine Associates and informed him that he was having trouble with anxiety. (ECF No. 32-5, Tab H). He explained to his doctor that he had "a real conflict" with his boss and "has been called in to see his boss on multiple occasions." (*Id*.). Plaintiff's physician prescribed him an antianxiety drug, Citalopram. (*Id*.). Shortly thereafter, Plaintiff informed Plutnicki, Charles, and several of his co-workers that he was taking Citalopram for anxiety and depression. (ECF No. 32-6 at 171, 194-95).

On one particular day during the winter of 2009-2010, inclement weather caused several road closures and created hazardous travel conditions in Plaintiff's work area. Management instructed any employee who could make it to the office to try to do so. (ECF No. 32-3 at 115-16). Plaintiff and several of his co-workers arrived at the office, only to be sent home after waiting around all day with no instructions. (*Id*. at 116). The following day, Plutnicki held a meeting and informed Plaintiff and his co-workers that they would not be paid for the prior day. (*Id*.). Plaintiff and several other co-workers spoke up and said that it was "bullshit" that they were not going to be paid. (*Id*. at 116, 118-19). According to Plutnicki, Plaintiff became belligerent and repeatedly forced the issue, causing Plutnicki to eject him from the meeting. (ECF No. 32-5, Tab D, ¶ 5). Plaintiff denies becoming belligerent and avers that he simply raised the same objections that everyone else did. (ECF No. 32-3 at 116). In any event,

Plaintiff's closed-door meetings with Charles became even more frequent and hostile in tone following that incident, often resulting in Plaintiff leaving Charles' office in tears. (ECF No. 32-3 at 115-16; ECF No. 32-6 at 159-60, 174).

On September 16, 2011, Plaintiff phoned dispatch to inform them that he had finished his regular assignments. (ECF No. 32-1 at 67-69). Dispatch instructed Plaintiff to begin an installation at a customer's home because the assigned technician, Brady Jones ("Jones"), was running behind schedule on his own work orders. (ECF No. 32-1 at 67-69). Upon arriving at the home at 4:15 PM, Plaintiff discovered that he would have to drill a hole in a wall of the house in order to complete the installation. (ECF No. 32-1 at 72-73; ECF No. 32-2 at 74-75). Because the customer was a renter, company policy required Plaintiff to obtain a written permission slip from the landlord before he could perform any drilling. (ECF No. 32-1 at 73). The customer informed Plaintiff that her landlord was on the way. (ECF No. 32-2 at 75-76). However, at some point a dispute arose between Plaintiff and the customer, causing her to call Defendant's customer service line and lodge a complaint concerning her "horrible experience" with Plaintiff. (ECF No. 32, Tab A, ¶¶ 8-15; ARM 000464). The customer indicated that Plaintiff didn't want to wait for her landlord because his quitting time was 4:30 PM, but that she had insisted that he wait. (*Id*.). At that point, the customer indicated that Plaintiff became angry and began throwing his equipment out of his vehicle. (*Id*.). The customer became so upset and frightened that she was sobbing on the telephone while lodging her complaint and would not allow Plaintiff to enter her home. (*Id*.). Plaintiff denied that any of the customer's claims were accurate. (ECF No. 32, Tab A, ¶ 14). However, upon reviewing an audio transcript of the call, Taylor noted that the customer sounded "sincerely and highly upset" and concluded that Plaintiff had acted inappropriately. (*Id*. at ¶ 15). As a result of the incident, Taylor issued Plaintiff a written

4

warning and suspended him for one day. (*Id*. at ¶ 16). The written warning stated that "any repeat bad attitude customer complaints or temper related issues will result in progressive discipline up to and to include termination." (ECF No. 32-2 at 92).

On October 5, 2011, Plaintiff sent a handwritten complaint (the "Internal Complaint") to Plutnicki, Charles, and Human Resources Director Jeff Walker alleging that he felt he was being mistreated by Charles and others due to his anxiety and depression. (ECF No. 32-7, Ex. 12). Upon receiving a copy of the Internal Complaint, Taylor initiated an investigation and spoke to both Plaintiff and Charles about the allegations of mistreatment. (ECF No. 32-6 at 155; ECF No. 32, Tab A, ¶ 18). In addition to general allegations of teasing by co-workers, Plaintiff informed Taylor that he believed Charles was giving him a hard time because of his anxiety and because he had spoken up about the unpaid snow day. (ECF No. 32, Tab A, ¶ 20). Prior to this conversation, Taylor had not been aware that Plaintiff suffered from anxiety or was taking medication. (*Id*.). After speaking with Plaintiff, Taylor instructed Charles and Plutnicki to take steps to improve Plaintiff's work environment and curtail the teasing from his co-workers. (Id. at ¶¶ 21-23). In response to Taylor's directive, Charles stopped ordering Plaintiff into his office for closed-door meetings and, indeed, stopped speaking to Plaintiff entirely. (ECF No. 32-6 at 212-13). Plaintiff indicated that this "was a relief" and that "[i]t was actually a pleasure to start working" again without harassment from Charles. (*Id*. at 213). Taylor and Walker followed up with Plaintiff on numerous occasions and were informed on each that Plaintiff was doing "fine" and "much better." (ECF No. 32, Tab A, ¶¶ 24-25).

On July 5, 2012, Plaintiff was assigned to do a particularly difficult commercial telephone installation. (ECF No. 32-2 at 96-99). When Plaintiff contacted Plutnicki to request assistance, two other employees, Pat Covert ("Covert") and Brian Moore ("Moore"), were sent.

(*Id*. at 100-102). However, when Covert and Moore informed Plaintiff that they would only stay until 4:30 PM, Plaintiff became upset and exclaimed that the situation was "fucking bullshit." (*Id*. at 105, 109). Moore informed Charles of the incident, and Charles, after consulting with Taylor, issued a verbal warning to Plaintiff regarding his temper. (*Id*. at 111; ECF No. 32-4, Ex. 7).

Later that month, Plaintiff complained to a customer during an installation that he was unhappy at his job and the schedule that it required. (ECF No. 32-3 at 125; ECF No. 32-4 at 126, 128). He also asked the customer if her own employer was hiring. (ECF No. 32-4 at 129). Plaintiff conceded that his complaints rose to such a degree that "the conversation probably led to her thinking that [he] was ranting and raving." (*Id*. at 126). On July 31, 2012, the customer phoned Defendant's customer service line to complain about Plaintiff's behavior, stating that she had a "horrible experience" with Plaintiff. (ECF No. 32, Tab A, ¶ 29; ECF No. 32-4, Ex. 8). As a result of the complaint, Charles and Taylor spoke with Plaintiff and informed him that his angry outbursts were becoming a pattern and needed to be curtailed. (ECF No. 32, Tab A, ¶ 29; ECF No. 32-4 at 132-33).

On August 9, 2012, Plaintiff, while on-call, was assigned to perform a telephone reconnect for a customer. (ECF No. 32-4 at 134). Plaintiff questioned whether the assignment was sufficiently urgent to warrant a response during on-call hours and was informed by the dispatcher that the customer was on house arrest and required telephone service immediately. (*Id*. at 134-36). Plaintiff then sent an email to the on-call team asking whether anyone closer to the customer's house would be willing to pick it up. (*Id*. at 135). In response, one of Plaintiff's team members, Eric White, telephoned Plaintiff to scold him for questioning the urgency of the job. (*Id*. at 135). According to Plaintiff, White yelled at him, swore at him, and then hung up on

6

him. (*Id*.). That evening, Plaintiff sent the following email to his on-call team: "For the fucking record!! I simply asked roger why are we doing non pay reco ! I am on my way to do the fucking jb I did not pawn this job on to any one! If you think I suck get some one else on your fucking team!!!!!!!" (ECF No. 32-4 at 134; ECF No. 32-4, Ex. 9).

Following the August 9, 2012 email, Taylor met with Plaintiff and expressed his concern once more that Plaintiff's anger had developed into a pattern of rudeness, profanity, and hostility to employees and co-workers. (ECF No. 32, Tab A, ¶ 32-34). Plaintiff agreed that the email was inappropriate, but blamed White for triggering his angry response. (*Id*. at ¶ 32). Nonetheless, Taylor made the decision to terminate Plaintiff. (*Id*. at ¶ 34). Taylor informed Plaintiff of his termination on August 17, 2012. (ECF No. 32-4 at 141-42). White was not punished for his part in the incident because he did not have a similar pattern of rudeness, hostility, and angry outbursts. (ECF No. 32, Tab A, ¶ 35).

### III. LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). As to materiality, "only

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perski*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

## IV. DISCUSSION

Plaintiff alleges that Defendant unlawfully terminated him on the basis of his disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*[1] He also contends that Defendant retaliated against him for complaining to his bosses about disability-based harassment from his co-workers.[2] Plaintiff's claims are analyzed pursuant to the familiar three-step burden-shifting framework articulated in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-05 (1973). *See Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004). Pursuant to this framework, a plaintiff must first make out a *prima facie* case of discrimination or retaliation. *Williams*, 380 F.3d at 761 (citing *Taylor v. Phoenixville School*

---

[1] The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability . . . in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The PHRA similarly prohibits discrimination on the basis of disability. 43 P.S. § 955(a).

[2] The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter. 42 U.S.C. § 12203(a). The same is true under the PHRA. 43 P.S. § 955(d).

*Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for each challenged employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Finally, the plaintiff bears the burden of demonstrating, by a preponderance of the evidence, that the defendant's articulated reason for the challenged action is a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804-05; *Bielich v. Johnson & Johnson, Inc.*, 6 F.Supp.3d 589, 605 (W.D. Pa. 2014).

In order to establish a *prima facie* case of discrimination, a plaintiff must demonstrate that: (1) he is a disabled person within the meaning of the ADA; (2) he was qualified for the position that he held; and (3) that he suffered an adverse employment action under circumstances that could give rise to an inference of unlawful discrimination on the basis of that disability. *Proudfoot v. Arnold Logistics, LLC*, 2014 WL 5823075, at *5 (M.D. Pa. Nov. 10, 2014); *Bielich*, 6 F.Supp.3d at 611. Similarly, to state a *prima facie* claim of retaliation, a plaintiff must allege that: (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) "a causal connection [existed] between the employee's protected activity and the employer's adverse action." *Williams*, 380 F.3d at 759. Here, Defendant does not challenge that Plaintiff is a disabled person, was qualified for the position that he held, engaged in a protected activity, and/or was subjected to an adverse employment action. Rather, Defendant maintains that Plaintiff was terminated entirely because of his recurrent anger management issues and inability to control his temper. Defendant contends that Plaintiff's documented history of inappropriate behavior both vitiates the third element of his *prima facie* case and serves as a legitimate, non-discriminatory justification for his termination. For present purposes, the Court will assume that a *prima facie* case has been established with respect to each

claim because the burden at the *prima facie* stage is "much less onerous than proving pretext with similar evidence." *Opsatnik v. Norfolk Southern Corp.*, 2008 WL 763745, at *4 (W.D. Pa. Mar. 20, 2008), *aff'd*, 335 F. App'x 220 (3d Cir. 2009) (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998)). *See also Moussa v. Penn. Dept. of Public Welfare*, 2010 WL 1333333, at *8 (W.D. Pa. Mar. 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the defendant's *prima facie* and pretext-based arguments each relied on the same evidence).

In the instant case, Defendant's articulated reason for its decision to fire Plaintiff was that Plaintiff lost his temper and treated co-workers and customers with rudeness and hostility on three separate occasions during the 30 day period immediately preceding his termination despite having been previously cautioned to control his angry outbursts. To defeat Defendant's motion for summary judgment, Plaintiff must point to some evidence that might cause a factfinder to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). It is not enough to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.2d at 765). In other words, Plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109. Plaintiff may do so by showing that "the employer in the past subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not within his class more

favorably, or that the employer discriminated against other members of his protected class." *Moussa*, 2010 WL 1333333, at *9 (quoting *Fuentes*, 32 F.3d at 765).

In the instant case, Plaintiff contends that Defendant's proffered reason for his termination – his angry outbursts and inappropriate behavior – is a pretext for unlawful discrimination because other employees also engaged in angry outbursts but were not disciplined or terminated. To establish pretext by comparison to other employees, Plaintiff must demonstrate that similarly situated employees outside of the protected class were treated more favorably or were accused of the same offense but disciplined in different ways. *Johnson v. Public Services Enterprise Group*, 529 F. App'x 188, 191 (3d Cir. 2013); *Zahavi v. PNC Financial Serv. Group, Inc.*, 2009 WL 904699, at *12 (W.D. Pa. Mar. 31, 2009) (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004)). Employees are considered to be "similarly situated" when they "dealt with the same supervisor [and] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Zahavi*, 2009 WL 904699, at *12 (quoting *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 603 (M.D. Pa. 2002)) (internal quotations omitted). Thus, a plaintiff attempting to establish pretext based on inconsistent disciplinary actions must show that the comparator's misconduct "[was] of comparable seriousness to his own infraction" and that no "differentiating or mitigating circumstances" existed. *Tyler v. SEPTA*, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002), *aff'd*, 85 F. App'x 875 (3d Cir. 2003).

In attempting to meet this burden, Plaintiff relies heavily on the fact that White was not punished for phoning Plaintiff and yelling and swearing at him on August 9, 2012, causing Plaintiff to send the angry email that resulted in his termination. However, Plaintiff concedes that White, unlike Plaintiff, had no previous history of rudeness or hostility to customers or co-

workers. Courts have repeatedly held that co-workers who have markedly disparate disciplinary records are not "similarly situated." *See, e.g., Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (holding that employees with no history of prior discipline were not similarly situated to a plaintiff who had been disciplined on four prior occasions); *Moussa*, 2010 WL 1333333, at *9-10 (finding that a plaintiff who was discharged for a "pattern of sexual harassment" was not similarly situated to an employee who was accused of an isolated incident of harassment of a less severe nature); *Skrocki v. Carpenter Tech. Corp.*, 2007 WL 1002122, at *5 (E.D. Pa. Mar. 30, 2007) (holding that two employees who engaged in a verbal and physical altercation resulting in the plaintiff's termination were not similarly situated because plaintiff had a "far worse" disciplinary record).

Plaintiff attempts to salvage the comparison to White by noting that Plaintiff also had no history of prior incidents when he was issued a one day suspension following his first altercation with a customer on September 16, 2011. However, it is undisputed that Taylor, the manager who made the decision to suspend Plaintiff, was unaware of Plaintiff's anxiety and depression at the time that he made that decision. (ECF No. 32, Tab A, ¶ 20). It is axiomatic that an adverse employment decision cannot have been based on discriminatory animus if the decision-maker had no knowledge of the alleged disability. *See, e.g., Jones v. UPS*, 214 F.3d 402, 406 (3d Cir. 2000) ("It is, of course, an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability."); *Straining v. AT&T Wireless Services, Inc.*, 144 F. App'x 229, 232 (3d Cir. 2005) (rejecting an ADA claim where the supervisor making the adverse employment decision had no knowledge of the plaintiff's alleged disability); *Matteo v. George E. Delallo Co.*, 2014 WL 896633, at *3 (W.D. Pa. Mar. 6, 2014) (rejecting a discrimination

claim where it was undisputed that "none of the decision-makers were aware of [plaintiff's] alleged disability").[3]

Plaintiff next contends that "numerous technicians" used profanity in emails to each other and were not disciplined. (ECF No. 31 ¶¶ 205, 208; ECF No. 40 ¶ 233). However, Plaintiff concedes that there is no evidence that Defendant was aware of those emails until it conducted discovery in the course of this litigation. (ECF No. 36 ¶¶ 203-04, 207-08; ECF No. 35 at 5). It is well-established that an individual cannot serve as a disciplinary comparator based on conduct that was unknown to management. *See, e.g., Ade v. KidsPeace Corp.*, 698 F.Supp.2d 501, 515 (E.D. Pa. 2010) ("[T]here is no evidence that any manager or HR employee at KidsPeace was made aware of [the alleged comparator's] actions. Without knowledge of wrongdoing, management cannot be expected to take any disciplinary action. As a result, these individuals cannot be described as similarly situated to plaintiff."); *Saellam*, 2008 WL 5286836, *9 (holding that an employee fired for falsifying records was not similarly situated to another employee who committed a similar offense because there was no evidence that management ever learned of the comparator's misconduct); *Moussa v. Commonwealth of Penn. Dept. of Public Welfare*, 289 F.Supp.2d 639, 652 (W.D. Pa. 2003) (employee who engages in similar conduct, but whose actions are not known to decision makers, cannot serve as comparator).

In sum, Plaintiff has failed to point to any evidence in the record to create an inference that his termination was the product of unlawful discrimination. To the contrary, the record reflects that Plaintiff was terminated because of numerous incidents in which he displayed an

---

[3] The Court also notes that the incidents cited by Plaintiff involved significantly different levels of severity. White's outburst occurred during an internal discussion with a co-worker, whereas Plaintiff's initial discipline resulted from an incident that occurred in the presence of (and was partially directed at) one of Defendant's customers. Employees are not similarly situated where their misconduct is not "comparable in severity or scope." *Moussa*, 2010 WL 1333333, at *10 (collecting cases).

inability to control his temper and behave appropriately around co-workers and customers. Summary judgment is therefore appropriate on each of Plaintiff's claims.[4]

## V. CONCLUSION

For all of the foregoing reasons, Defendant's Motion for Summary Judgment (Docket No. 29) is GRANTED. An order will be entered granting judgment in favor of Defendant and against Plaintiff.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

CC/ECF: All parties of record.
Date: December 10, 2014

---

[4] In his Amended Complaint, Plaintiff also claimed that he had been subjected to a hostile work environment because of his disability. However, Plaintiff concedes that summary judgment in favor of the Defendant is appropriate as to this claim. (ECF No. 35 at 3).